**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT CONOHAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>DIGITAL ASSETS INC. dba ANA LUISA, a New York corporation; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

## INTRODUCTION

1. Defendant Digital Assets Inc. dba Ana Luisa ("Defendant" or "Digital Assets") is New York corporation that owns, operates, and/or controls http://analuisa.com/ ("Website"), an online platform that sells jewelry. What visitors to the Website – including visitors from locations in California – do not know is that as soon as they request to visit the Website, or click on a link to the Website, data about their activities, and technical data about their devices and browsers, are transmitted to social media companies for their de-anonymization and ongoing tracking. This is done without the consent of visitors, or the authorization of a court order, therefore violating California's Trap and Trace Law, found within the California Invasion of Privacy Act ("CIPA"). This is done for the purpose of benefitting Defendant and (at least) two social media/advertising networks TikTok and Facebook/Meta.

2. CIPA was enacted with the "inten[t] to protect the right of privacy of the people of California[,] recognizing "that the invasion of privacy resulting from the continual and increasing use of [new eavesdropping] devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." California Penal Code § 630.

3. Advocates and beneficiaries of commercial surveillance take the view that the activities challenged in this suit are ubiquitous and utterly harmless. On that basis, they conclude that the dissemination of data that can be used to digitally fingerprint visitors to commercial websites cannot possibly fall within the ambit of statutes, like California Penal Code § 638.51, that prohibit non-consensual and non-authorized tracing of the sources of communications. Their viewpoint fails to recognize (1) the ability of the likes of TikTok and Meta and X Corp. to identify individuals based on such seemingly mundane data points as screen size when compiled with others; (2) what can be gleaned about individuals based on the type of tracking facilitated by the commercial surveillance at issue here; and (3) disturbing uses to which visitor data collected by the trap and trace devices on Defendant's Website might be put in the present political environment.

**JURISDICTION**

4. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen of a different State or subject of a foreign state.

5. This Court has general jurisdiction over Defendant Digital Assets Inc. dba Ana Luisa, a New York corporation, because it is a New York corporation and because it has its headquarters in Brooklyn, NY.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant resides in the District, where its headquarters are located.

**PARTIES**

7. Plaintiff Robert Conohan ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California.

8. Defendant Digital Assets Inc. dba Ana Luisa ("Defendant" or "Digital Assets") is New York corporation that owns, operates, and/or controls http://analuisa.com/ ("Website"), an online platform that sells jewelry.

9. The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

10. Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

## **FACTUAL ALLEGATIONS**

11. When a person visits a website from an electronic device, their browser makes a "request" for that website to load onto their device. As that process occurs, advertising code and invisible trackers on the website being visited can cause the person's browser to make as many as hundreds of requests – each request containing information about the person, their device and their browser – to undisclosed third parties *other than the website proprietor*. The data contained within the requests may seem innocuous or mundane, and too isolated to identify the person. Some of it, such as "HTTP request headers," are necessary to navigate to a website. However, when compiled, the data transmitted through the requests to the social media and advertising companies can reveal a detailed behavioral profile of the person's online activity. Tracked online activity can reveal such things as a person's income bracket, educational level, sexual orientation, health status and

political leanings. Each of these represents information the dissemination of which most people want to control themselves.

12. The trove of data collected about a person through advertising code and invisible trackers is used to generate unique identifiers – strings of code that identify the device and browser a person is using. Unique identifiers are recognized when a visitor returns to the website from which their data was collected, or when the visitor visits other websites containing the same advertising code or hidden trackers in connection with which the identifiers were generated.

13. The traditional method employed by ad networks using software on websites to identify, target and/or track persons for the commercial and financial benefit of advertisers and others, are cookies. Cookies are small text files that code or scripts running on websites cause to be stored on a website visitor's browser. A well-known use for cookies is to allow one's browser to remember an account login information, or the items that you have added to a shopping cart or "wishlist" on a website. However, cookies are also used link a collection of data associated with a person with the person's internet activity – in other words, tracking. Typically cookies serve as a storage unit for unique identifiers.

14. In summary, cookies often function as the container, while unique identifiers are the tracking key, together enabling persistent identification of a person for advertising and analytics purposes – an identification that at certain points in time may entail obvious identifiers such as name, email address, physical address or phone number, and at other points may not.

15. The Website, found at http://analuisa.com/, owned an operated by Defendant, sells jewelry. By virtue of Defendant's installation of the tracking software or code of third parties TikTok and Meta, the Website also serves as a venue for commercial surveillance.

16. When Plaintiff visited the Website around on or around November 30, 2025, she was subjected to the commercial surveillance described herein, and data that can identify her for tracking and other purposes were transmitted to Tik Tok and Meta and possibly other third parties. The data transmission (and collection) injured her, and at the same time benefitted Defendant and the third parties receiving her data.

17. Plaintiff's visit to the Website occurred within the applicable statute of limitations and when the code and software described herein was being deployed on the Website.

**TikTok Code on the Website**

18. Defendant installed on its Website code created by TikTok, a social media platform and ad network, that transmits the data of visitors, such as Plaintiff and members of the putative class to TikTok servers, and the analytics.tiktok.com domain (the "TikTok Code"). This domain is part of TikTok for Business.[1]

19. The TikTok Code deployed on the Website uses cookies to transmit and store data about visitors to the Website. The cookies cause the transmission of the following types of data to TikTok: (a) browsing history, (b) interactions with the Website, (c) device and browser information, (d) session information, (e) user identifiers and (f) geolocation data. This process effectively creates a digital "fingerprint" of the visitor that can be used to associate the visitor with their internet activity. The TikTok Code causes the data transmitted to TikTok to be matched with existing data TikTok has acquired and accumulated about hundreds of millions of Americans.

20. The TikTok Code sends a "session_id" associated with a visitor and the visitor's device, a unique identifier, to the analytics.tiktok.com domain by use of the cookie "tt_sessionid." TikTok uses this identifier to capture where the visitor goes on the Website, and what they do on its pages, and associate that behavior with other data about the visitor. This allows TikTok to measure the effectiveness of an advertiser's (the website operator's) marketing, and to target specific Website users with specific marketing campaigns.

21. The TikTok Code uses other cookies, including the "_ttp" cookie, which, according to TikTok, are "used to help with the measurement, optimization, and targeting of your campaigns."[2]

---

[1] https://ads.tiktok.com/business/en (last visited 2/7/2026).

[2] https://ads.tiktok.com/help/article/tiktok-pixel (last visited 2/7/2026).

22. The TikTok Code begins to transmit the data described above as the Website upon the visitor's request to navigate to the Website, i.e., to have the Website load onto the visitor's device for viewing.

23. The image below displays a window on a visitor's screen displaying the Ana Luisa Website, as the Website first appears on the screen, through the use of Google Chrome's "Developer Tools." Developer Tools, which, when activated, appears on the right one-third of a device's screen and displays events taking place during a visit to a website, at the code level. The image below demonstrates the process of the TikTok Code on the Website causing a visitor's device to transmit some of the types of information discussed *supra* to TikTok at the moment the Website loaded on the visitor's screen.




<u>**Meta Code on the Website**</u>

24. Defendant installed on its Website code belonging to Meta, a social media platform and ad network, that transmits the data of visitors, such as Plaintiff and members of the putative class to Meta servers, and the facebook.com domain (the "Meta Code"). The Facebook.com

domain is part of Meta's digital advertising platform, which aims at collecting user information through cookies in part to conduct behavioral analysis and targeted advertising.[3]

25. The Meta Code uses the cookie "_fbp" to assign a unique identifier to distinguish visitors to websites. It uses cookies cause the transmission of the following types of data to Meta: (a) browsing history, (b) interactions with the Website, (c) device and browser information, (d) session information, (e) user identifiers and (f) geolocation data. The Facebook Code allows Meta to match a visitor's data against Meta's own user database to identify individuals, track their behavior across devices, and build profiles of them.

26. Once the Facebook Code delivers visitor data to Meta, the data is used to: "track visitor activity on your website . . . to measure the effectiveness of your ads, [and] to define custom audiences for ad targeting . . ."[4]

**Plaintiff Was Subjected to Trap and Trace Devices on the Website**

27. Plaintiff visited the Website on or around November 30, 2025. When Plaintiff did so, data about them, their devices and their browser was sent to TikTok and Meta by way of electronic impulses.

28. The purpose of this transfer of data from the Website and Plaintiff's device to TikTok and Meta was for de-anonymization, profiling, targeting and ongoing tracking (as described supra). The transfer benefitted Defendant, on the one hand, and the data collecting third-party (TikTok and Meta), on the other hand, commercial and financially.

29. On information and belief, TikTok and Meta took Plaintiff's information, transmitted via the Website, and added it to its pre-existing collection of data about Plaintiff for purposes including profiling and tracking.

30. The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation and use of trap

---

[3] https://www.facebook.com/privacy/policies/cookies/ (visited 2/7/2026).

[4] https://developers.facebook.com/docs/meta-pixel/ (visited 2/7/2026).

and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072 (C.D. Cal. 2024) (surveillance software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

31. CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

32. The TikTok Code and the Meta Code meet the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because each captures signaling information (who the visitor is, and what they are doing) in order to identify "the source" of an "electronic communication" – namely the exchanges of signals and data that constitute a visit from an electronic device to a website.

33. The TikTok Code and the Meta Code are each "reasonably likely" to identify the source of electronic impulses "incoming" to the Website from visitors and their devices.

34. Defendant did not obtain a court order before installing the TikTok Code or Meta Code on its Website.

35. Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with TikTok or Meta for the purposes of de-anonymization, fingerprinting, profiling and tracking.

**Possible Non-Commercial Consequences of Non-Consensual Data Sharing**

36. The data collection and manipulation initiated by the TikTok Code and Meta Code may engender consequences beyond tracking and advertising targeting for commercial purposes. There are recent examples of tech companies exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United

States citizens or residents. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[5] Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[6] It was recently reported that Google handed over user data to the United States Department of Homeland Security ("DHS") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[7]

## CLASS ALLEGATIONS

37. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons visiting the Website from locations in California whose identifying data was transmitted to TikTok and Meta when they visited the Website within the limitations period.**

38. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

39. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which

---

[5] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[6] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

[7] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant installed the TikTok Code and Meta Code on the Website;
b. Whether each of the TikTok Code and Meta Code is a trap and trace process as defined by California law;
c. Whether Plaintiff and Class Members are entitled to statutory damages;
d. Whether Class Members are entitled to injunctive relief; and
e. Whether Class Members are entitled to disgorgement of unlawfully obtained data.

40. TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by TikTok and Meta, Plaintiff is asserting claims that are typical of the Class.

41. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

42. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of California Trap and Trace Law

### Cal. Penal Code § 638.51 (the "California Trap and Trace Law")

43. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

44. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

45. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

46. Defendant uses a trap and trace process by deploying the TikTok Code on its Website because the TikTok Software is designed to capture the phone number, email, routing, addressing and other signaling information of website visitors. As such, the TikTok Software is designed precisely to identify the source of the incoming electronic and wire communications to the Website in violation of the California Trap and Trace Law.

47. Defendant did not obtain a court order before installing the TikTok Software on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology to identify visitors of its Website.

48. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2. An order declaring Defendant's conduct violates CIPA, and Cal. Penal Code § 638.51 specifically;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

5. Statutory damages pursuant to CIPA;

6. Prejudgment interest; and

7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: February 9, 2026

TAULER SMITH LLP

By: */s/ J. Evan Shapiro*
J. Evan Shapiro, Esq.

J. Evan Shapiro
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Robert Conohan*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: February 9, 2026

TAULER SMITH LLP

By: *<u>/s/ J. Evan Shapiro</u>*
J. Evan Shapiro

J. Evan Shapiro
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Robert Conohan*